L6TMCIRS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        19 CR 833 (SHS)

 5   MATTIE CIRILO,

 6              Defendant.                Sentence
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       June 29, 2021
                                         4:20 p.m.
 9

10   Before:

11
                        HON. SIDNEY H. STEIN,
12
                                         District Judge
13
                             APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   BY:  KIERSTEN FLETCHER
          Assistant United States Attorney
17
     COHEN FRANKEL & RUGGIERO, LLP
18        Attorneys for Defendant
     BY:  MARK I. COHEN
19

20   Also Present:
     Gillian M. Feehan
21

22

23

24

25
```

L6TMCIRS1

1      (Case called)

2          MS. FLETCHER:  Good afternoon, your Honor, Kiersten

3   Fletcher for the government.

4          THE COURT:  Good afternoon.

5          MR. COHEN:  Good afternoon, your Honor, Mark Cohen and

6   Gillian Feehan, with the Court's permission, on behalf of

7   Ms. Cirilo, who is on my behalf.  Ms. Feehan is admitted

8   attorney in New Jersey, and she submitted her application

9   during the pandemic for admission into this court.  She was

10  vital in the handling of the case.  She is not yet admitted.

11  If it's OK with the Court, I would like her to join us at

12  counsel table.

13         THE COURT:  Of course.  Welcome to all of you.

14         Please be seated in the courtroom.

15         I understand that you've told those in the well -- I

16  have informed my deputy that you're all vaccinated, is that

17  correct?

18         MR. COHEN:  I am, sir.

19         THE COURT:  Except for the defendant.

20         I'm told by my deputy that the revised protocols,

21  these COVID protocols change all the time, that the new

22  protocols that just went into effect permit those in the well

23  to take their masks off if everyone is vaccinated and,

24  apparently, my deputy informs me that if somebody is not, as

25  long as that person keeps his or her mask on, we can do it this

L6TMCIRS1

way.  We will proceed and my deputy tells me that you have all

given her the necessary contact information.  I do try to

follow the Court's protocol guidelines since they have been

adopted by the board of judges.

        We are here for the sentencing of Ms. Cirilo.  The

information I have is the presentence report prepared on April

1 of this year and revised on April 30, along with the addendum

to the presentence report and the sentencing recommendation of

365 days' incarceration.  That's a variance from the guideline

range that the probation department is recommending of 57 to 71

months on an offense level of 25 and criminal history category

of I.

        In addition to the PSR, that is the presentence

report, I have the defense submission, dated June 15, with the

attached letters, and the defense submission requests a

sentence of time served with three years' supervised release

or, in the alternative, time served with three years'

supervised release and a special condition of 12 months' home

confinement.  I also have the government letter, dated June 22,

which unusually recommends a sentence below the stipulated

guideline range as sufficient but not greater than necessary in

this case.

        Last, I received yesterday, I believe, I received the

e-mail that came to chambers, dated June 24, 2021, it's

addressed to Ms. Cirilo, offering her the position of real

L6TMCIRS1

1    estate assistant, starting June 28.  Looks like it's for

2    Compass Real Estate.

3          Is there any additional information I should have,

4    government?

5          MS. FLETCHER:  Not from the government, your Honor.

6    Thank you.

7          THE COURT:  Is there any additional information I

8    should have, defense?

9          MR. COHEN:  No, sir.

10         THE COURT:  Mr. Cohen, have you had a full opportunity

11   to read and discuss all this information with your client and

12   have you in fact read and discussed it with her?

13         MR. COHEN:  Yes, sir.

14         THE COURT:  Do either you or your client have any

15   objections to the findings of fact in the presentence report?

16         MR. COHEN:  Findings of fact, no, sir.

17         THE COURT:  Ms. Fletcher.

18         MS. FLETCHER:  Not with respect to findings of fact,

19   no.

20         THE COURT:  I hereby adopt the findings of fact in the

21   presentence report.

22         Let me ask Ms. Fletcher to begin with, in the view --

23   first of all, Ms. Fletcher, I think this is the first

24   sentencing in what I'll call the Cheedi conspiracy, very

25   similar to the Ketabchi conspiracy.  If you'll remember, in the

L6TMCIRS1

1    Ketabchi conspiracy, I asked that the government provide me and

2    all the parties with its view of the relative ranking of

3    wrongdoing of the defendants, and the government chose to view

4    it as tiers, if you remember that.

5            What I would appreciate is the government submitting a

6    similar form.  It doesn't have to be tiers.  What I'm asking

7    the government, and I want you to obviously copy everybody on

8    it, is your view of the relative culpability and why for each

9    of the defendants in Cheedi, all right?

10           MS. FLETCHER:  Yes.  One point of clarification, your

11   Honor.  Would the Court like the government to include all of

12   the defendants in the Cheedi case or only those who have

13   pleaded guilty and are about to be sentenced?

14           THE COURT:  Aha.  Good question.

15           MS. FLETCHER:  As the Court might imagine, the

16   government's investigation of certain defendants is ongoing.

17           THE COURT:  You can say that, but I would like to know

18   its current view of everyone, even those who are set for trial.

19   My concern is, again, is that the defendants received this.  I

20   don't want it to be in any sense *ex parte*.

21           MS. FLETCHER:  Understood.

22           THE COURT:  My records show, this is the first

23   sentencing in Cheedi, correct?

24           MS. FLETCHER:  That's right, your Honor.

25           THE COURT:  Mr. Cohen, let's hear you.  What do you

L6TMCIRS1

1    want to tell me?  I have read all of this information.  I don't

2    think you've been before me before.  Maybe you have been.

3            MR. COHEN:  Judge, I have been in front of you for

4    four sentences in the last 30 years, two of which involved

5    deaths and one of which involved about 100 and some odd Hobbs

6    Act robberies.  Actually, this is the first time I'm before you

7    in a case that does not involve violence, extreme violence.

8    And I think the first sentence, I figured out, was before 9/11,

9    sir, so it's been a long time, but here I am.

10           THE COURT:  Forgive me for not remembering you.  If

11   you are talking about 100 Hobbs Act robberies, it must have

12   been the robberies of the houses in northern New Jersey.  Is

13   that what it was?

14           MR. COHEN:  It was AUSA Jessica -- I'm trying to

15   remember her last name.

16           THE COURT:  Ortiz.

17           MR. COHEN:  Yes.

18           THE COURT:  It was 400 household robberies in northern

19   New Jersey and the local authorities couldn't get to the bottom

20   of it so they brought in the feds, and it involved on Canal

21   Street the stolen goods were being brought and fenced and the

22   proceeds were then used to buy gold on 46th Street and it was

23   melted down.  Is that the case?

24           MR. COHEN:  I would say that my client was related to

25   that case.  I'm familiar with that part of the case, but --

L6TMCIRS1

1    Judge, if you'd like, in the late '90s, you sentenced a client

2    of mine whose 13-year-old nephew shot and killed his

3    12-year-old nephew by accidentally finding the gun in the

4    house, and that was a case that we handled, and I actually, the

5    day after 9/11, ran into my client after he was released from

6    custody, so I will never forget that case, sir, as long as I

7    live.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L6THCir2

1    THE COURT:  All right.  Well, let's go on.

2    MR. COHEN:  Let's start here, yes.

3    THE COURT:  Let's go on to Cirilo.

4    MR. COHEN:  Look, Judge --

5    THE COURT:  The lead-in to that, sir, was I read all

6    of this information, and if you have the background with me,

7    you know I take it very seriously.  I've read it all.

8    MR. COHEN:  I know.

9    THE COURT:  I thought about it.  I have a view.  What

10   do you want me to know?

11   MR. COHEN:  Judge, I want you to know that if left to

12   her own devices, I'm not so certain that Ms. Cirilo would have

13   obstructed justice.  There's no doubt --

14   THE COURT:  It's easy to blame the husband.

15   MR. COHEN:  Not blaming the husband.  Not blaming the

16   husband.  Here's what I'm blaming.  This is a young woman who

17   sat during a raid in front of everyone and made her way over to

18   the agents.  Not only did she make her way over to the agents

19   and speak to the agents, but she took the agent's contact

20   information.  She had an intention that day of following up

21   with the agents.  She made contact with the agents on a couple

22   of occasions, I think twice if I'm not mistaken, before,

23   before, the onslaught came of "You don't need to go to talk to

24   the agents.  Why would you go talk to the agents?  You're a

25   low-level nobody.  They're not interested in low-level

L6THCir2

nobodies." And the pressure came from her supervisor, the one

she worked for, for a salary, your Honor, for $30,000 in

approximately ten months that she was there. And the pressure

came as follows: It came as "You don't have to worry about

it." It came -- I'm sorry. This might be me.

THE COURT: It can only be you.

MR. COHEN: Oh, OK. I'm loud, so if you can hear me

without it, is that OK?

THE COURT: Yes.

MR. COHEN: All right. So my point, your Honor, is

that it came from, "Oh, you don't have to worry about it. I

spoke to my lawyer, and my lawyer says it's OK for everybody to

come back to work" and "You don't have to worry about your

computer and your cell phone which the agents took because,

ahh, let it go. I'm going to replace it for you."

Judge, it was a chorus, because you have to remember

that Mattie Cirilo answered an ad in Craigslist. That's how

she came to meet all of these people who have appeared in front

of you. She answered an ad years back for --

THE COURT: I thought her husband had also worked

there?

MR. COHEN: He did, but she didn't know him at the

time. She met her husband when she answered the ad.

THE COURT: I see.

MR. COHEN: What happens is she goes and answers an ad

L6THCir2

because she's a young kid out of high school.  Her parents

tried to get her to go to college.  She didn't want to go to

college.  She signed up for cosmetology school.

THE COURT:  I saw.

MR. COHEN:  That didn't work out.  She signed up for

another school.  That didn't work out.  She was delivering

pizzas.  She was running around with three different jobs.  And

what we can say is she was an immature 20-something-year-old

who didn't have any direction.  She saw that she needed to

start to earn a few bucks.  She was getting pressure at home.

She answered an ad, and she went to work in an office with good

intentions of having something on her résumé that she could

rely on, your Honor, and move forward in her life.  And

unfortunately, she met people whose views about what they were

about to embark upon and what they had already been embarked

upon was, ahh, it doesn't matter what happens to other people

we're going to enrich ourselves.

THE COURT:  So it doesn't -- in other words, she

didn't really try to prevent people from withdrawing and she

didn't really --

MR. COHEN:  I didn't say that.

THE COURT:  -- try to prevent chargebacks --

MR. COHEN:  No.

THE COURT:  -- and she didn't really delete the

information?  Others made her do it, is that it?

L6THCir2

1          MR. COHEN:  No, Judge, I didn't say that at all.  In

2    fact, she's never said that, and I've never said that, sir.  In

3    fact, all I'm saying to you is that at the point of entry into

4    this, she walked into a preexisting sewer, for lack of a better

5    way to describe it.  She was not that girl.  She met her

6    husband there.  She met other people.  They became friendly.

7    One thing leads to another.  She's easily influenced at that

8    time in her life, and the job works for her, and she sits

9    there.

10         THE COURT:  She knew what she was doing was wrong and

11   illegal, and she knew it when she was doing it.  The former

12   phrase is from her allocution.  My latter phrase is from her

13   statement here.

14         MR. COHEN:  What I'm saying to your Honor is I'm

15   saying that when she first started, it was clerical, and then

16   her direct supervisor gave her a script.  She knew it was

17   wrong.  She's going to tell your Honor she knew it was wrong,

18   and she chose to do it anyway, and that's why she embarked upon

19   criminal activity.  No issue.

20         Then later on, after she's given the script and, well,

21   it doesn't work, so she passes him on to the supervisor to try

22   to keep the fraud going, what happens is at a later point, your

23   Honor, it steps up a bit.  She's assisting people in Utah with

24   the actual chargeback work, and there's no denying that.  And,

25   Judge, it's important to note that despite the fact that she

L6THCir2

didn't make it to the agents because she was convinced that she

was a nobody and she was pressured and she agreed on her own to

wipe the data, but one thing you need to know, sir, I got a

call from Ms. Cirilo within a couple of days, I guess, after

she came out on bail.  She came to my office, and she described

what went on with the agent.  And I looked at her and I was

like, what the heck happened?  How did that get derailed?

So, Judge, you know what we did?  We sat down.  We had

conversation after conversation in about two weeks of time, and

then she said -- and it didn't matter whether her husband was

in the case, it didn't matter who else was in the case -- she

says I'm going to do what I was going to do.  And she sat down

in a room with the government, and she explained what she knew.

I can't remember any pushback from the government.  And in

fact, Judge --

THE COURT:  Why would they push back if she's telling

them what she did wrong?

MR. COHEN:  Well, that was my sense, that she was

telling the truth, because I didn't see pushback, exactly.

So my point to you is she makes the statements, and

the government says to me -- look, it was no great surprise to

me, your Honor.  I've been practicing 30 years.  She didn't

know enough for substantial assistance stature.  She didn't

know.  She had direct supervisors.  She saw what they did.

Yes, your Honor, she ignored what they did.  Yes, your Honor,

1    she helped them to do what they did, but remember, she didn't

2    share in those profits.  She kept the job going, no doubt.

3              All the while, sir, she has her eye on a different

4    ball.  All the while, she's looking to improve herself.  She's

5    saving money, going to real estate school.  And you know what,

6    Judge, honestly, she's been troubled with this.  She wants

7    this.  She knows that her real estate license is in jeopardy if

8    she ever wants to sit for the exam.  But look what she did in

9    the last two weeks.  In addition to trying to adopt a child, in

10   addition to her volunteer work on behalf of animals -- and,

11   Judge, none of this was done before -- excuse me, after the

12   case started.  This was all done by Mattie Cirilo because she

13   cares about other beings.  She cares about animals.  She cares

14   about a child who got a bad break in life.  She does what we

15   would want our daughters to do generally.  And I respectfully

16   submit, your Honor, that these acts that she committed, while

17   they are terribly serious and they helped prolong and deepen a

18   horrific fraud, your Honor, they shouldn't define her because

19   she's --

20             THE COURT:  I don't think it defines her.  The

21   question is what's an appropriate punishment?

22             MR. COHEN:  Well, I'm going to tell you what I think.

23             THE COURT:  Well, you told me in your letter.  I see

24   it.

25             MR. COHEN:  Well, I'm going to tell you more.  I think

L6THCir2

after 36 years of working in the criminal justice system,

Judge, I think that she has a moral compass to avoid

recidivism.  I think --

THE COURT:  I'm not really concerned about her

recidivism.  I am concerned about general deterrence, and I'm

concerned about appropriate punishment.

MR. COHEN:  OK.

THE COURT:  She's not going to recidivate.

MR. COHEN:  Thank you.  I appreciate you saying that

and realizing that.

I'd like to say this about that issue:  Judge, I came

out of the state system.  I was an economic crime prosecutor in

the Bronx D.A.'s office, and we used to -- we had a different

system.  Our system of restitution in the state when I started

was different.  A defendant was responsible for --

THE COURT:  I'm going to impose restitution on her on

a joint and several basis.  She'll never be able to make it up

unless she becomes a hedge fund manager.

MR. COHEN:  But the point I'm making is that

punishment -- and it's right and it's the law and I'm not

quibbling with it, but I'm suggesting to your Honor that it is

so much more severe and so much more debilitating and so much

more of a burden that she's going to carry for the rest of her

life, maybe 40 more years, and honestly I really -- I urge you

to think about the fact that if there was no pressure around

L6THCir2

```
1   her, she would have gone.  She would have said exactly what she
2   said to the government.  She would have said what she said to
3   the government in a negotiation letter.  She would have said
4   what she said to the government after her change of plea
5   hearing when they called me and they said:  Does Ms. Cirilo
6   know anything about this?  Judge, if it wasn't for the
7   pressure, she would have gone and she'd have accepted the
8   responsibility; she'd have admitted what she did.  And frankly
9   speaking, Judge, I really believe that she has learned her
10  lesson, and it will be a recurring lesson every time she has to
11  pay whatever amount it is in restitution, every time that she
12  has to look at her credit report.
13          THE COURT:  You have not said a word in response to my
14  general deterrence concern.
15          MR. COHEN:  I'm going to get there.
16          THE COURT:  Go, get there.
17          MR. COHEN:  And there I am.  Judge, I respectfully
18  believe that if you polled a group of people and you said:
19  Listen, you can spend six months in jail or you could pay back
20  $250,000 on probation, I will tell you, Judge, from my own
21  personal experience, and I'll explain why, there would be a
22  whole heck of a lot of people who would rather go to jail.  And
23  I'll say this:  I know it because in the state system, when I
24  defend people and I say you could have a city year with no
25  supervision or you could have five years of probation, people
```

L6THCir2

take the city year.  To me it doesn't make sense.  It's the

same thing here.

I submit, respectfully, by the time she is done

financially here -- I mean, yes, you're right, her earning

capacity isn't going to be enormous.  How much of a

percentage --

THE COURT:  The real estate assistant job, I think,

was 35 --

MR. COHEN:  35,000.

THE COURT:  -- 34,000.

MR. COHEN:  And don't forget, Judge, her husband's

going to jail.  She's got two kids.  I mean, she has ability.

She's willing to improve herself.  She has shown that.  But I

think, most importantly, Judge, look into her heart.  She takes

stray animals.  She did that before she knew that there was a

Judge Stein.  I've spent a lot of time with her, sir.  I've

talked to her parents.  I've talked to her sister.  I think

this was so out of character, sir.  I think that the general

deterrence that you would send a message that even if you make

a paltry amount compared to the big fraudsters, even if your

role is limited, even if your participation temporally is

limited you are going to be jointly and severally responsible

for an incredible amount of money, maybe more money than she's

capable of earning in her lifetime.  That is a huge punishment,

your Honor.  That is such deterrence.  You're taking people,

L6THCir2

1    you're saying your credit is garbage and you are going to be on

2    the hook for what everybody else gave.  That's pretty good

3    deterrence, I respectfully submit.

4            THE COURT:  I'm not sure I've seen any study that

5    indicates financial responsibilities are a function -- that

6    deterrence is a function of financial responsibilities.

7            MR. COHEN:  I would respectfully submit that it is

8    disproportional for somebody to commit a crime and make 30,000

9    and be responsible for paying hundreds of thousands.  And I

10   respectfully believe -- maybe I'm wrong, and I don't have an

11   empirical study.  I'm not trying to pull the wool over your

12   Honor's eyes.  I'm just trying to pull from my own defense

13   experience, what I see going on when people choose between

14   probation and jail, and to me it's the same thing.  It's the

15   same thing.  This is a severe punishment as is, as I propose

16   it.  And, Judge, if you think her liberty needs to be taken

17   away from her, I've suggested to keep her at home because she's

18   at a crucial point with the children.  Her husband's child has

19   issues.

20           THE COURT:  I saw.

21           MR. COHEN:  And she's doing the right thing.

22           THE COURT:  I saw.

23           MR. COHEN:  Sir, you know, I know I've stood in this

24   courthouse week after week and heard federal judges, retired

25   and present, say your client should have thought about the kids

L6THCir2

```
1    before she did what she did, and I have no quibble with that.

2    But I think the level of care that she renders, I think the

3    responsibility that she takes, I think her selflessness in

4    adopting these children, her hobby in caring for animals shows

5    that she needs to be --

6            THE COURT:  I understand the position.  Is there

7    anything else you wanted to say?

8            MR. COHEN:  No, sir.

9            THE COURT:  All right.  Thank you.

10           MR. COHEN:  Thank you.

11           THE COURT:  Ms. Cirilo, you have the opportunity to

12   address me.  You don't have to say anything, but before you do

13   that, let me hear from the government so you hear what both

14   sides are saying, and then I'll listen to anything you want to

15   say.  I do want to inform you that anything you say can be used

16   against you and that you have no obligation whatsoever to speak

17   to me, but if you want to say anything to me, obviously, I'm

18   here to listen.

19           Ms. Fletcher, speak to me about relative culpability,

20   about role in the offense here.  And I really do not agree with

21   the acceptance of responsibility points that apparently the

22   government felt was appropriate, at least in the plea

23   agreement.  Seems to me this is not an extraordinary case from

24   the standpoint of counteracting the inability -- well, not

25   inability.  The guidelines are set up so that if you have
```

L6THCir2

|    |
|----|
| 1  | obstruction points, you don't get acceptance of responsibility |
| 2  | points unless it's an extraordinary case.  I don't see this as |
| 3  | an extraordinary case, and therefore, unless somebody's going |
| 4  | to talk me out of it, I'm not inclined to adopt the guideline |
| 5  | calculation entered into by the government and the defense. |
| 6  | But rather, I believe the probation department's calculation is |
| 7  | correct.  Speak to me. |
| 8  | MS. FLETCHER:  Yes, your Honor.  With respect to the |
| 9  | guidelines, our submission is -- our submission in the plea |
| 10 | agreement set forth the government's position.  To the extent |
| 11 | the Court disagrees, of course, that's the Court's prerogative. |
| 12 | Your Honor, with respect to this defendant's relative |
| 13 | culpability, the government's position is that the guidelines, |
| 14 | regardless of whether it's 41 to 51 or 57 to 71 months, the |
| 15 | guidelines would call for a sentence that is greater than |
| 16 | necessary for this defendant. |
| 17 | THE COURT:  I agree. |
| 18 | MS. FLETCHER:  And the reason for that is, in part, |
| 19 | because of her relative culpability.  If the Court looks at I |
| 20 | think the now 12 defendants charged in the Cheedie case, this |
| 21 | defendant is pretty squarely defendant No. 12 in the ranking |
| 22 | order with respect to their role in committing the underlying |
| 23 | fraud.  And there are a few reasons for that and a few |
| 24 | arguments that Mr. Cohen has made that I think the government |
| 25 | should correct, at least a little bit. |

1              Mr. Cohen focused a lot on how Ms. Cirilo came to be

2      involved in Bis Op, and he's right, she did answer a Craigslist

3      ad.  She became an appointment-setter and a compliance person

4      for Olive Branch Marketing.  She had a largely administrative

5      role where, at least in the government's view, she did not have

6      full appreciation for the fraudulent scheme.  She met her

7      husband, her now husband and codefendant, Derrek Larkin, there.

8      But at some point shortly after her employment there, a number

9      of people with whom she worked at Olive Branch were arrested,

10     including Bill Sinclair and Arash Ketabchi and others.  And

11     that is a fact that the Court will hear from the government in

12     a number of these sentencings because, unlike many of the

13     defendants in the Ketabchi case, the defendants in the Cheedie

14     case knew about the Ketabchi case.  They knew that the

15     government had prosecuted a number of individuals involved in

16     this scheme and had convicted those individuals of committing a

17     number of crimes, either through guilty pleas or through -- or

18     at trial.

19             So the defendant, even though she came to this scheme

20     maybe naive to what the broader scheme was, she quickly learned

21     that people around her were being charged with crimes for their

22     participation in this scheme.  Her home, the home she shared

23     with her husband, was searched in 2017.  Ultimately, she was

24     not charged in 2017, but those were certainly red flags that

25     should have made her and, in the government's view, did make

L6THCir2

her keenly aware that these sales floors were perpetrating a
fraud.  So rather than exit completely from this conspiracy,
choose not to have anything to do with it, encourage her
husband not to have anything to do with it, she and Derrek
Larkin took a job with Joseph Ciaccio and Joseph Minetto who
were operating a sales floor along with Ryan Hult that was
essentially doing exactly what Olive Branch Marketing did.

        And in that role, in the role that Ms. Cirilo took on
that floor, she became aware from her firsthand experience and
from her job on that floor that not only had this other
employer that she worked for been involved in fraud but so was
the current employer.  And, again, rather than exit at that
point, she furthered the fraud.  She moved from her
administrative role to a role fighting chargebacks.  She wasn't
in the role for very long, but it was that conduct, it was
that -- her participation during that time that landed her
within the government's crosshairs as the investigation
progressed.

        Then, of course, there's the obstruction.  And
obstruction is, I would suspect, probably something she views
as her worst mistake in life but is extremely aggravating
conduct and is conduct that even in the government's plea
agreement she gets obstruction offense level increases for.
Whether she did it -- whether it was her own idea or whether
she was acting at the direction of others, there is no dispute

L6THCir2

that she knew that Homeland Security Investigations had
searched her place of employment, the second place where she
was located that had been searched by law enforcement.  And
after the search, she on her own volition chose to remotely
delete evidence from her phone.  I can't say what was going on
in her head when she did that or what she intended to do
vis-a-vis talking to law enforcement, but she certainly wiped
the data from her phone.  The government obtained a recording
from a cooperating witness in which she and her husband
described for the cooperating witness how he too can wipe data
from his phone so he too can avoid getting caught.

         So, yes, she starts in a relatively low-level position
where she doesn't get it, but over the course of now two and a
half years, between the time that her prior employer was
arrested, by the time the search happens, she's aware that this
is a fraudulent scheme, and she chose to destroy evidence of
the scheme.  So all of those factors are why the government
submits that here, as the Court has done for every other
defendant in this and the related case, a sentence of
imprisonment is appropriate to serve the aims of general
deterrence.  Put another way, it cannot be that someone can
knowingly be participating in a fraudulent scheme that
victimizes the people that this scheme victimizes, delete
evidence of the scheme, and be spared prison.

         So now that is all to say, and I think I started by

L6THCir2

saying this, the government does not argue that this defendant

should go to prison for four years or five years, or whatever

term is contemplated by the guidelines, and would suggest to

your Honor that some defendants who are comparable to this

defendant in terms of relative culpability are Thomas O'Reilly

who, I believe, is referenced in our submission.  The Court

will recall Mr. O'Reilly was a salesperson on the Carlisle

Vanguard floor whose role was sort of -- I would say whose role

in the underlying fraud scheme was comparable to this

defendant's and who ultimately actually pleaded guilty to

obstruction related to his destruction of evidence.  The Court

sentenced him to 366 days.

            The arguments that the defendant's counsel made

related to her childcare responsibilities and her family

situation reminded the government during his comments of Ray

Quiles who, the Court will recall, was also sentenced to 366

days' imprisonment.  And so without suggesting that that's

necessarily the appropriate sentence here, because the

government doesn't have a specific sentencing recommendation

for the Court, the government suggests that these are

defendants who, in the government's view, having looked at all

of the defendants in this case and the related case, are

comparable from a relative culpability perspective.

            So I hope that's answering the Court's question.  If

the Court has other questions, the government is happy to

L6THCir2

1    address them.  Otherwise, we'll rest on our submission.

2              THE COURT:  All right.  Thank you.

3              Ms. Cirilo, what would you like to tell me?

4              THE DEFENDANT:  Good afternoon.

5              THE COURT:  Why don't you do this, Ms. Cirilo:  If you

6    go into that booth that has the HEPA filter in it, you can take

7    your mask off.

8              THE DEFENDANT:  Good afternoon, your Honor.  Thank you

9    for hearing me.  I really have been waiting to talk to you.

10   I'm sorry, I just never imagined I would be here.  But I just

11   wanted to answer your question because you'd asked me a

12   question at my plea hearing.  You asked me, why did I do this?

13   So I just wanted to talk and explain just me.

14             I'm 30 years old, and I have two kids.  I was a

15   stay-at-home mom for most of the last five years.  For the past

16   five years, I've been a stay-at-home mom.  I just, as you saw,

17   got hired -- actually, yesterday was my first day at my job,

18   which I have been -- I really wanted to be a real estate agent.

19   I actually went and passed the course.  I even passed the state

20   exam, but I was denied my license because of my charges.  So

21   I'm just -- I was really excited about this job because I can

22   still have a career in the industry, even though I can't have

23   my license.

24             So I know that Mark kind of explained a little bit

25   that I just was kind of young.  The first company -- my first

L6THCir2

job, my first full-time job ever was the company where I worked

and met some of my coconspirators.  And that was a different

company than these companies, but I was there for a year, and

then I followed some of my coworkers to the second company.

        Very shortly after, I had my son in 2016, and I

stopped working.  I stayed home for two years to raise him and

my stepson who I consider to be my own son.  And how I got in

here is in 2019, I really wanted to enroll my son into day care

because I just thought it was important, and I wanted him to be

socializing and things like that.  So we just could not afford

that at the time with one income.  So I was looking for work,

and my supervisor at this company -- well, I knew him from my

first ever full-time job.  That's where I met him, and he

called me -- well, he offered me to work as his secretary,

which is how I became at this company.  And I was to just be

clerical, administrative, answer the phones, and things like

that.  But I was given a full speech by at least three of my

managers when I got there that because they did know about this

other case and --

        THE COURT:  You're talking about Olive Branch?

        THE DEFENDANT:  Yeah.  And I was told this is such a

great program.  It's a different program.  The person that

designed the program even talked to me and said that people are

successful.  They just have to do exactly this.  That's where

my script and things came into the picture, but, obviously, I'm

L6THCir2

1    not saying that I never -- I found out that this wasn't right

2    and they weren't doing right by these people, but I just felt

3    like it was none of my business.  It was -- it was convenient,

4    and I could work from home whenever I want.  It was an easy

5    job.

6                THE COURT:  And that was a mistake.

7                THE DEFENDANT:  Yeah.  So it was a huge mistake, and

8    then I obviously realized, especially when Detective Bastos

9    came to the office, that this was just absolutely, absolutely

10   horrible.  And so I called him -- I texted with him a bunch --

11   well, over the course of a couple of weeks, the detective and I

12   made an appointment to come to his office even, and I wanted to

13   show him my job and I was also interested in getting my things

14   back, which he told me I could have them back.  But less than a

15   week later, my supervisor who brought me in called us up and

16   said what my attorney said, that the lawyer said it was OK.

17   Everything checked out.  That it's fine.  We can go back to

18   work.  I said, "I still have to go to the city and get my

19   things back," and he said, "No, I'm going to buy you new

20   things.  Don't worry.  Don't waste your time."  And that was

21   the biggest mistake, I think, because I wish I would have went

22   and spoke with him, because I respect -- my dad's here, and my

23   dad always taught me to respect the law, the system.

24               THE COURT:  But if you had done that, you would not

25   have gone to work with this company because you saw Olive

1   Branch was a fraudulent and criminal enterprise.

2            THE DEFENDANT:  Yeah, I did.  I ignored my morals, and

3   I was not raised to be there like this.

4            So after that I did go back there, which was a huge

5   mistake, and I did not -- I didn't speak to him.  I never went

6   to go speak to him.  I am sorry.  I went back there, and I

7   didn't want to be there.  I was there, though, and that was

8   just the worst thing I could have ever done.  But I just

9   started researching.  I told them I no longer wanted to work in

10  the office, and they let me work from home.  So I said fine.

11  Then I found my real estate school, and I started that process.

12  And actually, the morning that I was arrested was the day I was

13  meant to take my state exam.  So I never entered -- eventually

14  I went back, but they denied my license because of the case.

15           So I just learned a lot.  Like I said, this is not me

16  at all.  I would never want to hurt anybody.  I don't, that's

17  not who I am.  I am sorry to all of these people and their

18  families and just anybody that was hurt.  If I could do

19  anything to fix or make it go away, I would do it.  There's

20  just nothing I can do.  So I just have to accept and just live

21  with it and do better, which is what I intend to do.  I will

22  never, ever -- I know you probably -- I would never do anything

23  like this again, but I want to raise my kids to be better than

24  I was here.  And moving forward in the future, I plan to do

25  that and raise my kids right and just do my animal rescues and

L6THCir2

1    pursue some career in real estate, which I hope may be an

2    administrative career since I can't have my license.  I would

3    like to right my wrongs, and I accept everything I did, and I

4    accept my punishment too.

5              Thank you.

6              THE COURT:  All right.  Thank you.

7              MS. FLETCHER:  Judge, I'm sorry, I know that my time

8    to speak has ended, but can I just -- I feel like I should say

9    one thing --

10             THE COURT:  Go ahead.

11             MS. FLETCHER:  -- that I didn't when I spoke before.

12   I think when Mr. Cohen was speaking, I think I heard your Honor

13   say it's easy to blame the husband.  And Mark, Mr. Cohen,

14   responded, to his credit, and I think probably because his

15   client wouldn't want him to blame the husband, that he was not

16   blaming the husband.  But in the government's view, Derrek

17   Larkin is significantly more culpable in this scheme than

18   Ms. Cirilo --

19             THE COURT:  I realize that.

20             MS. FLETCHER:  -- and is very likely blameworthy for

21   her entree into this criminal conduct.  I didn't think that was

22   lost on the Court, but I just wanted to say it to be sure that

23   the Court understood that.

24             THE COURT:  All right.  I'm going to take a few

25   moments here to look over my notes.

L6THCir2

```
1              What's the restitution the government is seeking and
2    what's the position of the defense?
3              MS. FLETCHER:  Your Honor, the government would
4    request a slightly longer period of time to provide the Court
5    with a restitution sum and schedule, and that's because I
6    suspect that schedule and sum will be used for a number of the
7    defendants in this case.  And we'd like to, if we can --
8              THE COURT:  Does the statute give you 60 or 90 days?
9              MS. FLETCHER:  Ninety days, your Honor.
10             THE COURT:  Is that what you're seeking?
11             MS. FLETCHER:  Please, your Honor.
12             And with respect to forfeiture, which I expect might
13   be the Court's next question, the parties stipulated in the
14   plea agreement that the defendant should forfeit $30,000.  So
15   the government would request the Court impose that forfeiture
16   amount today as part of her sentence.
17             THE COURT:  Do you have a proposed order?
18             MS. FLETCHER:  I can --
19             THE COURT:  Preliminary order?
20             MS. FLETCHER:  I can submit one later today or --
21             THE COURT:  Please do so.
22             MS. FLETCHER:  -- later this week if the Court would
23   allow.
24             THE COURT:  Yes.
25             MS. FLETCHER:  But I understand Mr. Cohen consents to
```

L6THCir2

1    that amount, as he did in the plea agreement.

2              THE COURT:  Yes, send me a proposed preliminary order

3    of forfeiture which, if I remember correctly, becomes final

4    upon its entry, if I'm not mistaken.  Send it to me by --

5    today's Tuesday -- by the end of the day on Thursday.

6              MS. FLETCHER:  We will.  Thank you.

7              THE COURT:  Is the proposed restitution joint and

8    several with the Cheedie codefendants and Ketabchi codefendants

9    or just Cheedie?  What's the proposal?

10             MS. FLETCHER:  Your Honor, I expect the way we will

11   work it out is the defendants in the Cheedie case who were part

12   of the Corporate Development Center Alliance sales floor will

13   have a one forfeiture sum -- I'm sorry, one restitution sum

14   derived from -- related to the victims of those floors, and the

15   other defendants in the Cheedie case will have a different

16   number, and that number and the schedule of victims is separate

17   and in addition to the various schedules in the Ketabchi case.

18             THE COURT:  But the first grouping is not, is that

19   what you're saying?  You talked about a sales floor.  What was

20   the sales floor?

21             MS. FLETCHER:  Ms. Cirilo was employed by Corporate

22   Development Center and Alliance Education.  I expect the

23   restitution scheduled for her will include a schedule of

24   victims and a restitution sum that will be joint and several

25   with Joseph Ciaccio, Joseph Minetto, Joseph Depaola, and Derrek

L6THCir2

Larkin.  Those are the codefendants in the Cheedie case who

worked on that sales floor.  But to the extent Cameron

Brewster, for example, is convicted and sentenced, he operated

a different sales floor, and so I expect his schedule of

victims will be different.

THE COURT:  All right.  It will be a few moments.

Ms. Cirilo, I'm troubled by the fact that you knew

about this, the wrongdoing here, because you had been involved

in Olive Branch.  And from what I know of Olive Branch, I don't

know everything, but I presided over trial concerning that

operation, it's pretty clear that it was fraudulent.  And

nonetheless when you needed money and wanted to have an income

to support your family, along with your husband, you joined up

with an operation that, whether you knew about it in the

beginning or not -- and you probably should have known about it

in the beginning -- whether you did or not, you went to work

with them and you continued with them when you admittedly knew

that it was an illegal operation.  I'm very concern about that,

I really am.  You have to start making some clearer eyed

decisions about what you're doing and why.  Then there's no way

you didn't know that wiping out your phones was an effort to

obstruct justice.  I'm very troubled by that.

By the same token, I don't think you're going to do

this again.  I agree with your lawyer on that.  I certainly

hope you're more aware of those around you committing criminal

L6THCir2

wrongdoing.  I don't think there's anything really to be gained by taking you away from your children.  I am concerned about sending a message, which is general deterrence, and apparently the general deterrence and my efforts at general deterrence in the Ketabchi case didn't work.

I'm going to adopt the recommendation of the defense. I'm not going to send you to prison.  I certainly considered a community confinement center, but what I'm going to do is I'm going to sentence you to time served, three years' supervised release, with the special condition of one year of home detention.  You'll be allowed to work.  I want you to be able to work, but you are going to be detained to your home except for work and other preapproved activities by your probation department -- by your probation officer.  I'm going to give the government 90 days to submit a proposed restitution order, and I'm going to impose the $30,000 forfeiture.

You are going to have a significant financial responsibility in the future.  I think the important thing from your standpoint is I'm saving you from prison.  I don't know if that's the best thing to do because you seem to be pretty easily manipulated by others, but at this point in time, I'm giving you the benefit of the doubt.  If you violate any term or condition of your supervised release, though, I certainly will remember this proceeding and how I gave you the benefit of the doubt.  I won't be inclined to do that again.

L6THCir2

1          That's my intention.  Before I formally impose

2     sentence, government, is there any formal objection you wish to

3     lodge?

4          MS. FLETCHER:  No, your Honor.

5          THE COURT:  Defense?

6          MR. COHEN:  No, sir.

7          THE COURT:  All right.  Ms. Cirilo, please stand.

8          I do find that the total offense level is 25, the

9     criminal history category is I, the guideline range is 57 to 71

10    months.  I am adopting the guideline range set forth by the

11    probation department for the reasons I said.  I'm not adopting

12    the agreement in the plea agreement because I do believe this

13    is not an extraordinary case, and given the fact that the facts

14    indicate Ms. Cirilo did obstruct justice, I don't think she's

15    entitled to the acceptance of responsibility points.  The

16    result is an offense level of 25, a criminal history category

17    of I.

18         Pursuant to the Sentencing Reform Act of 1984, it is

19    the judgment of this Court that the defendant, Mattie Cirilo,

20    is sentenced to three years' supervised release with the

21    conditions recommended by the probation department, namely, the

22    following mandatory conditions:

23         One, she shall not commit another federal, state, or

24    local crime;

25         Two, she shall not illegally possess a controlled

L6THCir2

substance;

Three, she shall not possess a firearm or dangerous
weapon or destructive device;

Four, she shall refrain from any unlawful use of a
controlled substance.

I'm waiving the drug testing requirement in this case.

She shall cooperate in the collection of DNA as
directed by the probation officer.

She also shall comply with standard conditions one
through 12 plus the following special conditions:

One year of the three years' supervised release will
be on home detention where she can -- she's restricted to her
residence at all times except for employment, education, and
other activities preapproved by her probation officer.

She shall submit her person, property, residence,
vehicle, papers, computer, other electronic communications to
search by a probation officer and, if needed, any law
enforcement officer when there's reasonable suspicion
concerning a violation of a condition of supervised release.
You must notify the other individuals in your household of this
condition, including your husband.

You must provide the probation officer with access to
all requested financial information.  You must not incur new
credit charges or open additional lines of credit without the
pre-approval of your probation officer unless you are in

L6THCir2

1  compliance with the installment payment schedule that I will

2  enter if I approve a restitution order here.

3          You will be supervised by your district of residence.

4          I'm not imposing a fine because I find that the

5  defendant lacks the ability to pay a fine after taking into

6  account the presentence report, her family responsibilities,

7  and the restitution order I am going to enter.

8          I will sign a $30,000 forfeiture order when presented

9  to me by the government within the next few days.

10         I hereby order Ms. Cirilo to pay to the United States

11 a special assessment of $100, which is due immediately.

12         You will pay interest on all restitution amounts of

13 more than $2,500.

14         This is a substantial variance.  Mr. Cohen will be

15 able to explain that to you.  Among the reasons for the

16 variance are the defendant's age, the fact that she has two

17 young children, she was attempting to collaborate with the

18 government, and as the government says, she is the least

19 culpable of the people in this particular indictment.

20         I urge you, Ms. Cirilo, to take advantage of what the

21 Court is doing for you today by not incarcerating you as an

22 issue of general deterrence.

23         THE DEFENDANT:  Thank you, your Honor.

24         THE COURT:  Government, are you aware of any legal

25 reason why the sentence should not be imposed as I have stated

L6THCir2

1    it?

2              MS. FLETCHER:  No, your Honor.

3              THE COURT:  Defense?

4              MR. COHEN:  No, sir.

5              THE COURT:  I hereby order the sentence to be imposed

6    as I have stated it.

7              Ms. Cirilo, you have the right to appeal the sentence

8    I imposed on you, and if you cannot pay the cost of appeal, you

9    have the right to apply for leave to appeal *in forma pauperis.*

10             What's the limited waiver in the plea agreement,

11   government?

12             MS. FLETCHER:  I'm sorry?

13             THE COURT:  Is there a limited waiver of appeal rights

14   in the plea agreement?

15             MR. COHEN:  Guidelines down, your Honor.

16             THE COURT:  Pardon me?

17             MR. COHEN:  Guidelines down.

18             THE COURT:  Well, but the question was -- it was 22

19   and down?

20             MR. COHEN:  Right.  So we had 41 to 51, so below 51.

21             THE COURT:  That's what I was asking.

22             MR. COHEN:  Right.

23             THE COURT:  Does the government agree with that?

24             MS. FLETCHER:  Yes, your Honor.

25             THE COURT:  All right.  I do wish to inform you that

L6THCir2

| | |
|---|---|
| 1 | in your plea agreement you agreed to waive the right to appeal |
| 2 | the sentence and you agreed to waive the right to collaterally |
| 3 | attack the sentence if I sentenced you to 51 months or fewer |
| 4 | months in prison, and I've done that.  I haven't sentenced you |
| 5 | to prison at all.  If you request, the clerk of court will |
| 6 | prepare and file a notice of appeal on your behalf immediately. |
| 7 | Do you understand that? |
| 8 | THE DEFENDANT:  Yes. |
| 9 | THE COURT:  Government, are there open counts here? |
| 10 | MS. FLETCHER:  Yes.  The government moves to dismiss |
| 11 | open counts at this time. |
| 12 | THE COURT:  All right.  Granted. |
| 13 | I don't know what I can tell you, Ms. Cirilo, except |
| 14 | you need to thank your lucky stars here and you need to comport |
| 15 | yourself in the future in a very law-abiding way.  And I may |
| 16 | also suggest, based on what I've heard today, that you listen |
| 17 | to your parents in the future. |
| 18 | All right.  Good luck to you. |
| 19 | THE DEFENDANT:  Thank you, your Honor. |
| 20 | MR. COHEN:  Judge, thank you very much. |
| 21 | (Adjourned) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |